**WO**

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Chris Maples,<br><br>        Plaintiff,<br><br>v.<br><br>Pinal County, et al.,<br><br>        Defendants. | No. CV-19-05300-PHX-DWL<br><br>**ORDER** |

## INTRODUCTION

In March 2016, Crysta Proctor was sentenced to probation after being convicted of various non-violent offenses. In 2017, after her boyfriend began physically abusing her, Proctor sought permission from her probation officers in Pinal County to leave the jurisdiction—either by moving to Maricopa County (where she previously lived) or to Nevada (where she grew up). The probation officers repeatedly denied these requests, even though Proctor was visibly injured during some of her visits and even though she reported that her now ex-boyfriend's attacks had begun escalating in frequency and severity. During one visit in September 2017, Proctor disclosed that she had started carrying a knife because she was afraid for her life. In response, she was told to stop carrying the knife because she was violating the terms of her probation by possessing it. Eight days later, Proctor was murdered by her ex-boyfriend, who kicked in the door to her apartment before stabbing her, shooting her, and slitting her throat.

Proctor's estate and survivors have now asserted a § 1983 claim against the four

Pinal County probation officers who were involved, in one way or another, with Proctor's supervision. Plaintiffs' theory is that Defendants subjected Proctor to cruel and unusual punishment in violation of the Eighth Amendment through their deliberate indifference toward her safety. In response, Defendants have moved to dismiss the complaint on various grounds, including qualified immunity.

As explained below, Defendants are correct that the qualified immunity doctrine requires dismissal. Although this case involves troubling facts, Plaintiffs have not identified any prior case suggesting (let alone holding) that a probation officer may be sued under an Eighth Amendment theory for exhibiting deliberate indifference toward the safety of an out-of-custody supervisee. Indeed, Plaintiffs concede that the law supporting their position is "scant" and "non-precedential" and that "this is not a typical case in terms of published, available case law." (Doc. 17 at 5, 11.) Liability under § 1983 is not available unless the law in existence at the time of the challenged conduct was "developed in such a concrete and factually defined context to make it obvious to all reasonable government actors, in the defendant's place, that what he is doing violates federal law." *Shafer v. Cty. of Santa Barbara*, 868 F.3d 1110, 1117 (9th Cir. 2017). This standard is not satisfied here, so Plaintiffs' claim—despite its tragic nature—must be dismissed.

**BACKGROUND**

I.  Factual Background

The facts alleged in the first amended complaint ("FAC") are as follows. On March 7, 2016, Proctor was sentenced to three years of probation after pleading guilty in Maricopa County Superior Court to possession of marijuana and drug paraphernalia and identity theft. (Doc. 11 ¶¶ 25-26.)

On July 7, 2016, the Pinal County Adult Probation Department ("PCAPD") began supervising Proctor. (*Id*. ¶ 27.) During her term of probation, Proctor lived in an apartment in Casa Grande, which is in Pinal County. (*Id*. ¶ 29.) At some point during her term of probation, Proctor began a romantic relationship with Alec Perez. (*Id*. ¶ 30.)

On December 14, 2016, PCAPD Officer Jessica Clodfelter became Proctor's

assigned probation officer.  (*Id*. ¶ 28.)

On April 12, 2017, Proctor reported to Officer Clodfelter that she had suffered domestic abuse at the hands of Perez.  (*Id*. ¶ 37.)  Proctor's arm was in a sling at the time of the meeting.  (*Id*.)  Perez had fractured Proctor's elbow by throwing a glass candle at her and had also attacked her on a separate occasion inside her apartment.  (*Id*. ¶ 36.)  In response, Proctor's terms of probation were revised to include a prohibition against having contact with Perez.  (*Id*. ¶ 39.)

In May 2017, Perez attacked Proctor again.  (*Id*. ¶ 41.)  Perez punched Proctor in the face, grabbed her by the hair, threw her on the ground, and began strangling her.  (*Id*.)  A neighbor intervened, pulling Perez off Proctor.  (*Id*.)

At some unspecified point after this attack, but still in May 2017, Proctor informed PCAPD Officer Sandra Bowen of the attack and showed Officer Bowen the bruises on her right leg.  (*Id*. ¶ 42.)

In July 2017, Perez attacked Proctor again, this time grabbing her by the arms, throwing her onto her bed, and punching her.  (*Id*. ¶ 44.)

On July 19, 2017, Proctor reported this attack to Officer Clodfelter and sought permission to return to Maricopa County.  (*Id*. ¶ 48.)

In August 2017, Perez threatened to kill Proctor.  (*Id*. ¶ 50.)  He showed up at her apartment and kicked the front door off the frame.  (*Id*.)

On September 6, 2017, Perez threatened to kill Proctor again.  (*Id*. ¶ 52.)  When Proctor refused to let him into her apartment, he smashed her kitchen window and vowed to "come back with the right people" next time.  (*Id*.)

On September 7, 2017, Proctor obtained an order of protection against Perez.  (*Id*. ¶ 55.)  That same day, Proctor met with Officer Clodfelter and repeated her request to return to Maricopa County or alternatively to Nevada ("where she grew up and where her mother and children lived") because of Perez's ongoing violence and threats.  (*Id.*)

On September 27, 2017, Proctor spoke with PCAPD Officer Amanda Heinbaugh (because Officer Clodfelter was not available) and made "a desperate plea for permission

- 3 -

to move." (*Id.* ¶ 59.) In response, Officer Heinbaugh urged her to make a pro-con list about places to live and to speak with Officer Clodfelter. (*Id.* ¶ 60.) Additionally, in response to Proctor's disclosure that "she had been carrying a knife for protection" because "she was afraid for her life," Officer Heinbaugh instructed Proctor to stop carrying the knife "because it is in violation of her probation." (*Id.* ¶ 61.)

On October 5, 2017, Perez and an accomplice killed Proctor and three other people. (*Id.* ¶ 72.) Perez and the accomplice first shot a man who was sitting outside Proctor's apartment. (*Id.* ¶ 75.) Perez then kicked down Proctor's door, went inside, and killed Proctor and two of her friends. (*Id.* ¶¶ 75-76.) Perez and the accomplice stabbed Proctor, shot her, and slit her throat. (*Id.* ¶ 77.)

Perez and the accomplice have since been arrested and charged with four counts of murder. (*Id.* ¶¶ 78-79.) Perez admitted to the murders during an interview with police. (*Id.* ¶ 78.)

II. Procedural Background

On October 1, 2019, Chris Maples, who is Proctor's mother, the personal representative of Proctor's estate, and the legal guardian of Proctor's minor children, B.M. and B.P. (collectively, "Plaintiffs"), initiated this lawsuit. (Doc. 1.)

On October 17, 2019, Plaintiffs filed the FAC. (Doc. 11.)

On October 29, 2019, Officers Clodfelter, Bowen, and Heinbaugh, as well as their supervisor, PCAPD Chief Probation Officer Rod McKone (collectively, "Defendants"), filed a motion to dismiss. (Doc. 13.)[1]

On November 15, 2019, Plaintiffs filed a response. (Doc. 17.)

On November 22, 2019, Defendants filed a reply. (Doc. 22.)

…

…

---

[1] The original complaint named two additional defendants, Pinal County and PCAPD, but those entities are not named as defendants in the FAC. (Doc. 10 at 3 [redlines reflecting deletion of these defendants].)

**DISCUSSION**

The FAC asserts only one cause of action: a claim under 42 U.S.C. § 1983 against each defendant, in his or her individual capacity, for violating Proctor's Eighth Amendment right to be "to be free from cruel and unusual punishment." (Doc. 11 ¶¶ 93, 101, 103, 111, 119, 126, 136, 141, 149.) Defendants seek to dismiss the FAC on various grounds, including qualified immunity. (Doc. 13 at 12-13.) Because the qualified immunity argument is dispositive, the Court need not address Defendants' other arguments.

I. Standard of Review

"[T]o survive a motion to dismiss, a party must allege 'sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face.'" *In re Fitness Holdings Int'l, Inc.*, 714 F.3d 1141, 1144 (9th Cir. 2013) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (quoting *Iqbal*, 556 U.S. at 678). "[A]ll well-pleaded allegations of material fact in the complaint are accepted as true and are construed in the light most favorable to the non-moving party." *Id.* at 1144-45 (citation omitted). However, the court need not accept legal conclusions couched as factual allegations. *Iqbal*, 556 U.S. at 679-80. The court also may dismiss due to "a lack of a cognizable legal theory." *Mollett v. Netflix, Inc.*, 795 F.3d 1062, 1065 (9th Cir. 2015) (citation omitted).

II. Qualified Immunity

Qualified immunity is "'an immunity from suit rather than a mere defense to liability.'" *Pearson v. Callahan*, 555 U.S. 223, 231 (2009) (citation omitted). It should, thus, be resolved "at the earliest possible stage in litigation." *Hunter v. Bryant*, 502 U.S. 224, 227 (1991). *See also Keates v. Koile*, 883 F.3d 1228, 1234-35 (9th Cir. 2018) (acknowledging that "[d]etermining claims of qualified immunity at the motion-to-dismiss stage raises special problems for legal decision making" but clarifying that, despite those special problems, "a district court [may] dismiss[] a complaint for failure to state a claim based on a qualified immunity defense . . . [if] the complaint [fails to] allege[] sufficient

facts, taken as true, to support the claim that the officials' conduct violated clearly established constitutional rights of which a reasonable officer would be aware 'in light of the specific context of the case'") (citations omitted).

"Qualified immunity shields federal and state officials from money damages unless a plaintiff pleads facts showing (1) that the official violated a statutory or constitutional right, and (2) that the right was 'clearly established' at the time of the challenged conduct." *Ashcroft v. al-Kidd*, 563 U.S. 731, 735 (2011). A government official's conduct violates "clearly established" law when "'the contours of a right are sufficiently clear' that every 'reasonable official would have understood that what he is doing violates that right.'" *Id*. at 741 (citation omitted). Although there need not be a "case directly on point," "existing precedent must have placed the statutory or constitutional question beyond debate." *Id*. In other words, the case law must "have been earlier developed in such a concrete and factually defined context to make it obvious to all reasonable government actors, in the defendant's place, that what he is doing violates federal law." *Shafer,* 868 F.3d at 1117.

"Once the defense of qualified immunity is raised by the defendant, the plaintiff bears the burden of showing that the rights allegedly violated were 'clearly established.'" *LSO, Ltd. v. Stroh*, 205 F.3d 1146, 1157 (9th Cir. 2000). *See also Romero v. Kitsap Cty.*, 931 F.2d 624, 627 (9th Cir. 1991) ("The plaintiff bears the burden of proof that the right allegedly violated was clearly established at the time of the alleged misconduct.") (citation omitted).[2] Although it "is often beneficial" to begin the analysis by addressing whether a statutory or constitutional right has been violated, district courts are vested with discretion to determine "which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand." *Pearson*, 555

---

[2] Thus, Plaintiffs are incorrect that "[q]ualified immunity is an affirmative defense for which Defendants bear the burden of proof." (Doc. 17 at 9.) As noted, once the defense of qualified immunity is raised, the plaintiff bears the burden of demonstrating that the right was clearly established. Similarly, Plaintiffs' assertion that the question of fair warning "is an affirmative defense to be decided by the jury" (Doc. 17 at 11) is incorrect. *Serrano v. Francis*, 345 F.3d 1071, 1080 (9th Cir. 2003) ("whether the law at the time of the alleged constitutional violation was clearly established" is a "'purely legal' issue") (citation omitted).

- 6 -

U.S. at 236.

III. Clearly Established Right

The "essential principle" of the Eighth Amendment is that "the State must respect the human attributes even of those who have committed serious crimes." *Graham v. Florida*, 560 U.S. 48, 59 (2010). "The Cruel and Unusual Punishments Clause prohibits the imposition of inherently barbaric punishments under all circumstances. . . . [and] punishments . . . disproportionate to the crime." *Id*. "An express intent to inflict unnecessary pain is not required" for punishment to be cruel and unusual. *Whitley v. Albers*, 475 U.S. 312, 319 (1986). However, "[i]t is obduracy and wantonness, not inadvertence or error in good faith, that characterize the conduct prohibited by the Cruel and Unusual Punishments Clause." *Id*.

Plaintiffs concede that "this is not a typical case in terms of published, available case law" and that the law supporting their Eighth Amendment claim "is scant and consists of non-precedential cases." (Doc. 17 at 5, 11.) Nevertheless, they argue that the "obvious cruelty" of Defendants' actions "constitute[s] fair warning . . . that their acts and/or omissions were unlawful" and cite *Hope v. Pezler*, 536 U.S. 730 (2002), for the proposition that there need not be an existing case with similar facts for a right to be clearly established. The gist of Defendants' position is that "Plaintiffs have failed to identify a clearly established constitutional right of which every reasonable probation officer would have known." (Doc. 13 at 12.)

For purposes of qualified immunity, "officials can still be on notice that their conduct violates established law even in novel factual circumstances." *Hope*, 536 U.S. at 741. The "salient question" courts should ask "is whether the state of the law" at the time of the conduct in question gave the officials "fair warning" that their actions were unconstitutional. *Id*. In *Hope*, the plaintiff brought a § 1983 suit alleging a violation of the Eighth Amendment after state correctional officials handcuffed him to a hitching post for seven hours with no shirt, no bathroom breaks, and little water as punishment for his disobedience at a chain gang worksite. *Id*. at 734-35. The Supreme Court concluded that

the "obvious cruelty inherent in this practice," in conjunction with (1) binding precedent holding that handcuffing prisoners to fences for long periods of time violates the Eighth Amendment, (2) an Eleventh Circuit decision suggesting that denying drinking water to a prisoner for non-coercive reasons would violate the Eighth Amendment, and (3) a Department of Justice report informing the Alabama Department of Corrections that its use of the hitching post was unconstitutional, put reasonable officials on warning that such conduct was unlawful. *Id.* at 741-46.

The Ninth Circuit cited *Hope* in affirming the denial of qualified immunity in *Hardwick v. Cty. of Orange*, 844 F.3d 1112 (9th Cir. 2017). In *Hardwick*, the plaintiff brought a § 1983 suit alleging violations of the Fourth and Fourteenth Amendments after county social workers "maliciously used perjured testimony and fabricated evidence to secure her removal from her mother" in a juvenile dependency proceeding. *Id.* at 1114. The defendants argued that "the specific granular right to be free from deliberately fabricated evidence in civil child dependency proceedings where a parent's or child's protected familial liberty interest is at stake had not yet been 'clearly established' prior to the dependency proceeding at issue." *Id.* at 1117. The Ninth Circuit relied on a California statute denying civil immunity to public employees who maliciously commit perjury in a juvenile dependency proceeding, in tandem with the notion that "government perjury and the knowing use of false evidence are absolutely and obviously irreconcilable with the Fourteenth Amendment's guarantee of Due Process," to reject the defendants' invocation of qualified immunity. *Id.* at 1119-20. *See also id.* at 1118 ("No official with an IQ greater than room temperature in Alaska could claim that he or she did not know that the conduct at the center of this case violated both state and federal law.").

Here, Plaintiffs argue that the "obvious cruelty" of Defendants' actions—"trapp[ing] [Proctor] in a jurisdiction with her assailant as punishment for her criminal offenses"—constituted fair warning that their actions were unconstitutional. (Doc. 17 at 10.) But this is only part of what *Hope* requires. Qualified immunity does not hinge on whether officials acted in accordance with abstract norms of morality and human decency.

Instead, the officials must have had fair notice, derived from existing case law, that their conduct was unconstitutional. And although "a plaintiff need not find a case with identical facts in order to survive a defense of qualified immunity," "the farther afield existing precedent lies from the case under review, the more likely it will be that the officials' acts will fall within that vast zone of conduct that is perhaps regrettable but is at least arguably constitutional. So long as even that much can be said for the officials, they are entitled to qualified immunity." *Hamby v. Hammond*, 821 F.3d 1085, 1095 (9th Cir. 2016). *See also Kisela v. Hughes*, 138 S. Ct. 1148, 1152 (2018) ("This Court has repeatedly told courts—and the Ninth Circuit in particular—not to define clearly established law at a high level of generality.") (quotation omitted).

Plaintiffs have not identified any case that would have provided fair warning to Defendants that their actions were unconstitutional. As an initial matter, Plaintiffs acknowledge that the three decisions on which they seek to rely—a state-court decision from 1999, an unpublished district court order from 2016, and an unpublished Sixth Circuit memorandum disposition from 2000—are "non-precedential." (Doc. 17 at 5.) This, alone, undermines Plaintiffs' position. As the Ninth Circuit has explained, "[t]he right must be settled law, meaning that it must be clearly established by controlling authority or a robust consensus of cases of persuasive authority." *Tuuamalemalo v. Greene*, 946 F.3d 471, 477 (9th Cir. 2019). *See also Hines v. Youseff*, 914 F.3d 1218, 1229-30 (9th Cir. 2019) (rejecting plaintiffs' reliance on unpublished appellate and district court decisions to demonstrate the existence of clearly established law because "memorandum dispositions do not establish law" and although "unpublished district court decisions may inform our qualified immunity analysis . . . it will be a rare instance in which, absent any published opinions on point or overwhelming obviousness of illegality, we can conclude that the law was clearly established on the basis of unpublished decisions only") (quotations omitted).

In any event, the cases proffered by Plaintiffs are easily distinguishable. In *Badia v. City of Casa Grande*, 988 P.2d 134 (Ariz. Ct. App. 1999), the police arrested a woman (Perez) after she backed her truck into a parked car. *Id.* at 135. While in custody, Perez

told the police that she didn't want to be picked up by her boyfriend (Murillo) because he had made a death threat against her one month earlier. *Id.* at 136. Nevertheless, Murillo was present when Perez was released from the police station and he murdered her a few hours later. *Id.* Afterward, Perez's survivors and estate asserted a § 1983 claim against various members of the police department, arguing that they violated Perez's right to due process under the Fourteenth Amendment, but the trial court rejected that claim at summary judgment and the Arizona Court of Appeals affirmed, holding that "Defendants had no constitutional duty to protect Perez after releasing her from custody." *Id.* at 137-39. It is difficult to understand how *Badia*—which doesn't mention the Eighth Amendment and rejected the argument that the Fourteenth Amendment obligates police officers to protect out-of-custody individuals from harm—could have provided fair notice to Defendants that they were violating the Eighth Amendment.

Next, in *Keyes v. Johnson*, 2016 WL 4445751 (D. Or. 2016), the plaintiff, "a convicted individual engaging in community service in lieu of jail," alleged she was sexually abused by the state employee responsible for supervising her community service efforts. *Id.* at *1. That employee later pleaded guilty to criminal charges arising from the incident. *Id.* The *Keyes* court concluded the plaintiff could assert an Eighth Amendment-based § 1983 claim for "excessive force" but could not assert an Eighth Amendment-based § 1983 claim for "deliberate indifference" against the government agency that employed the abuser. *Id.* at *3-5. Here, Plaintiffs are not alleging that Defendants were the ones who personally attacked and murdered Proctor—the claim is that Defendants' deliberate indifference contributed to her murder at Perez's hands. *Keyes*, if anything, suggests the Eighth Amendment doesn't apply in that scenario.

Similarly, in *Little v. Wylie*, 2000 WL 178406 (6th Cir. 2000),[3] the plaintiff was sentenced to probation and ordered to perform community service as a term of her probation. *Id.* at *1. Because she was pregnant, the sentencing judge specifically ordered

---

[3] The Sixth Circuit allows the citation of memorandum dispositions issued before 2007. *See* 6th Cir. R. 32.1(a) ("The limitations of Fed. R. App. P. 32.1(a) do not apply.").

that her community service consist only of "light duty." *Id.* Nevertheless, the town official supervising her community service made her "pick up and move railroad ties and cinder blocks," which caused her to "experienc[e] pain, cramping and spotting," and required her to keep moving the railroad ties even after becoming aware that she was bleeding. *Id.* at *1-2. Afterward, the plaintiff apparently suffered a miscarriage. *Id.* at *1 n.3. Under those facts, the Sixth Circuit concluded the town official was not entitled to qualified immunity on the plaintiff's Eighth Amendment claim of deliberate indifference to serious medical needs. *Id.* at *3. Again, although *Little* (like *Keyes*) can be read as suggesting that the Eighth Amendment potentially applies to *some* conduct directed toward out-of-custody probationers,[4] it does not suggest that the type of conduct at issue in this case—failing, through deliberate indifference, to protect a probationer from a domestic abuser—is unconstitutional.

Finally, although Plaintiffs do not proffer it as a case directly supporting their liability theory (Doc. 17 at 5), it is also necessary to address *DeShaney v. Winnebago Cty. Dep't of Soc. Servs.*, 489 U.S. 189 (1989). In *DeShaney*, the plaintiff was a four-year-old boy who was beaten so severely by his father that he fell into a life-threatening coma. *Id.* at 193. County social workers had been aware of suspicious injuries and possible child abuse for over two years but failed to intervene. *Id.* at 192-93. The boy and his mother brought a § 1983 suit, alleging a denial of the Fourteenth Amendment's guarantee of due process, but the Supreme Court rejected that claim because "failure to protect an individual against private violence simply does not constitute a violation of the Due Process Clause." *Id.* at 197.

It is true that, in *DeShaney*, the Court recognized "that when the State takes a person

---

[4] *But see Wood v. Beauclair*, 692 F.3d 1041, 1045 (9th Cir. 2012) ("The Eighth Amendment prohibits cruel and unusual punishment *in penal institutions*.") (emphasis added); *Koch v. Wade*, 2016 WL 1381793, *2 (N.D. Cal. 2016) ("Although the Supreme Court has found that the Eighth Amendment requires the state to provide adequate medical care to *incarcerated* prisoners, that obligation has not been extended to convicts who are not in custody . . . .") (citation omitted); *Christensen v. Nelson*, 2010 WL 562883, *5 (D.S.D. 2010) ("[T]he Court has not been presented with and is unaware of reliable authority establishing the right of an unconfined person performing community service to a cause of action under the Eighth Amendment for being denied humane conditions of confinement.").

- 11 -

into its custody and holds him there against his will, the Constitution imposes upon it a corresponding duty to assume some responsibility for his safety and general well-being." *Id.* at 199-200. Although the *DeShaney* Court concluded that this "analysis simply has no applicability in the present case" because "the harms [the plaintiff] suffered occurred not while he was in the State's custody, but while he was in the custody of his natural father who was in no sense a state actor," *id.* at 201, Plaintiffs argue that the cited passage from *DeShaney* "is precisely what this case is about: but for the restraint on [Proctor's] freedom, she could have escaped her assailant" and "come and gone from Pinal County as she saw fit." (Doc. 17 at 5.) The problem with this argument, however, is that in the 32 years since *DeShaney* was decided, no court has actually interpreted the Eighth Amendment as authorizing liability against probation officers for displaying deliberate indifference toward the safety needs of out-of-custody supervisees.

At bottom, none of the cases cited by Plaintiffs approach the robust alternative showings made in *Hope* and *Hardwick*, which involved a combination of fair warning derived from law and standards (state statutes, factually similar decisional law, or DOJ reports) and an egregious violation of broadly defined rights (obviously cruel punishment or government perjury). The specific Eighth Amendment right at issue here—the right of a probationer to be transferred to another jurisdiction to escape violence at the hands of a non-state actor who resides in the same jurisdiction as the probationer—is far from clear. And without a clearly established right, Defendants are entitled to qualified immunity.

## CONCLUSION

This is a tragic case. The Court disagrees with Defendants' assertion that "Proctor's brutal death was due entirely to Perez and [his accomplice's] actions." (Doc. 13 at 9.) There's a legitimate argument that Defendants' actions (and inaction) helped contribute to Proctor's death. Nevertheless, not all tragedies are compensable through constitutional tort litigation. *Cf. DeShaney*, 489 U.S. at 1001 (even though "[t]he facts of this case are undeniably tragic," no constitutional violation occurred). Qualified immunity shields Defendants from liability.

Accordingly, **IT IS ORDERED** that Defendants' motion to dismiss (Doc. 13) is **granted**. This action is terminated and the Clerk of Court shall enter judgment accordingly.[5]

Dated this 10th day of April, 2020.

> Dominic W. Lanza
> United States District Judge

---

[5] Plaintiffs did not request leave to amend the FAC in the event of a dismissal and the Court declines to grant such leave *sua sponte* because amendment would be futile—Plaintiffs' claims fail due to qualified immunity, not due to a failure to allege facts with sufficient particularity. *AmerisourceBergen Corp. v. Dialysist W., Inc.*, 465 F.3d 946, 951 (9th Cir. 2006) (although leave to amend should be freely granted, "a district court need not grant leave to amend where the amendment . . . is futile").